1
2
3
4
5
6
7
8    **UNITED STATES DISTRICT COURT**
9    **CENTRAL DISTRICT OF CALIFORNIA**
10
11   GROVER C. WILLIS,                    )        Case No. EDCV 07-70-JWJ
                                          )
12              Plaintiff,                )        ORDER REMANDING ACTION
                                          )        FOR FURTHER PROCEEDINGS
13        vs.                             )
                                          )
14   MICHAEL J. ASTRUE,                   )
     Commissioner of Social Security      )
15   Administration,                      )
                                          )
16              Defendant.                )
                                          )
17   ─────────────────────────────────── )
18
19        Plaintiff seeks review of the decision of defendant, Commissioner of the
20   Social Security Administration, denying plaintiff's applications for Disability
21   Insurance Benefits and Supplemental Security Income.  As discussed below,
22   this Court vacates the decision of the Administrative Law Judge and remands
23   this action to the Commissioner for further proceedings.
24
25   **I.  SUMMARY OF DISTRICT COURT PROCEEDINGS**
26        On January 29, 2007, plaintiff Grover C. Willis filed a "Complaint" to
27   review the August 21, 2006 decision of the Commissioner under the Social
28   Security Act.  On February 8, 2007, defendant consented, pursuant to

1  28 U.S.C. § 636(c), to proceed before United States Magistrate Judge Jeffrey

2  W. Johnson in the instant action and to have the Magistrate Judge conduct any

3  and all further proceedings in this case and order the entry of final judgment;

4  plaintiff consented to the same on February 19, 2007.  On June 5, 2007,

5  defendant filed an "Answer to Complaint" along with a manual filing of the

6  Certified Administrative Record (hereinafter "CAR") of the administrative

7  proceedings in this matter.  On October 17, 2007, the parties filed a Joint

8  Stipulation addressing their respective claims.

9       This matter is now deemed under submission and ready for decision.

10

11  ## II.  FACTUAL BACKGROUND

12  **A.    Summary of Administrative Proceedings**

13       On December 1, 2004, plaintiff filed applications for Disability

14  Insurance Benefits and Supplemental Security Income, alleging an onset of

15  disability from August 15, 2001.  (CAR 11, 43-47, 244-246.)  His applications

16  were denied initially on December 29, 2004, and on reconsideration on

17  February 17, 2005.  (CAR 11, 18-22, 24-29.)  On March 1, 2005, plaintiff

18  requested a hearing before an Administrative Law Judge.  (CAR 11, 30.)  On

19  March 2, 2006, Administrative Law Judge Jay E. Levine (hereinafter "ALJ")

20  conducted a hearing, at which plaintiff appeared with representation and

21  testified on his own behalf.  (CAR 249-265.)  Vocational expert Sandra Fioretti

22  (hereinafter "VE") provided testimony regarding plaintiff.  (CAR 260, 262-63.)

23  On August 21, 2006, the ALJ issued an opinion denying benefits.  (CAR 11-

24  15.)

25       Plaintiff sought Appeals Council review on August 28, 2006; the Appeals

26  Council denied review on December 27, 2006, making the decision of the ALJ

27  the final decision of the Commissioner in this matter.  (CAR 6-10.)  See 20

28  C.F.R. § 404.900(a)(5).

**B.   Facts Regarding Plaintiff's Personal History, Medical Condition and Treatment**

Born December 2, 1951, plaintiff was fifty-four years old at the time of his hearing before the ALJ. (CAR 43, 252.) Plaintiff has a tenth grade education; he completed truck driving school in Oregon in 1989, and obtained a commercial driver's license. (CAR 253.) Plaintiff has past relevant work experience as a hand packer, welder, tube washer, general laborer at a construction company, mini-storage worker at an airport, truck driver, assembler, and brake press operator. (CAR 254.) Plaintiff alleges a disability onset date of August 15, 2001, (CAR 43, 244), due to schizophrenia. (CAR 18, 24.)

For more than three years, plaintiff received extensive medical treatment at Riverside County Department of Mental Health (hereinafter "Riverside County DMH"). (CAR 130-176.) On September 17, 2001, Ramesh Patel, M.D. completed an assessment of plaintiff at Riverside County. (CAR 122.) Dr. Patel noted that plaintiff was supporting himself with temporary jobs, and had begun experiencing auditory hallucinations fifteen months earlier. (CAR 122.) The voices in plaintiff's auditory hallucinations were accusatory and argumentative, and threatened to kill plaintiff. (CAR 122.) The voices were also consistent with specific people and personalities in plaintiff's past. (CAR 122.) The doctor diagnosed plaintiff with "Psychosis NOS [not otherwise specified]" and polysubstance dependence on Axis I, and gave plaintiff a current and highest past year Global Assessment of Functioning (GAF) rating of 50. (CAR 122.) Dr. Patel prescribed medication to reduce the hallucinations. (CAR 122.)

A Riverside County DMH progress note from the same day indicated that plaintiff had a continuous history of substance abuse from age 13 until age 49, using, inter alia, methamphetamine, tetrahydrocannabinol (THC), cocaine,

1    opium, codeine, hash, and alcohol.  (CAR 175.)  During an October 17, 2001

2    visit with Dr. Patel, plaintiff reported having auditory hallucinations for sixteen

3    to seventeen months, but denied visual hallucinations.  (CAR 174.)  Dr. Patel

4    reported that voices called plaintiff names, and told plaintiff that he was no

5    good and they would kill him.  (CAR 174.)

6         Medication logs from Riverside County DMH documented that doctors

7    continuously prescribed plaintiff with Zyprexa during a period from October

8    17, 2001 to June 1, 2005, and also prescribed Haldol[1] on June 12, 2002.

9    (CAR 130-31, 220.) During a November 21, 2001 visit with Dr. Patel, plaintiff

10   commented that his medication was helping him "a lot." (CAR 172.)

11   Dr. Patel opined that plaintiff was improving clinically and rated him as

12   "symptomatic but stable." (CAR 172.)  A progress note dated December 19,

13   2001 noted that the voices plaintiff was hearing were quieter; the voices would

14   also discuss plaintiff's past use of drugs and alcohol.  (CAR 171.)  Plaintiff

15   admitted feeling better and Dr. Patel noted that he was improving clinically.

16   (CAR 171.)

17        A Riverside County DMH progress note from February 13, 2002

18   indicated that plaintiff was sleeping well, had good energy, and had begun

19   working at a new job three times per week.  (CAR 167.)  A March 20, 2002

20   progress note reported that the voices in plaintiff's head were sometimes loud.

21   (CAR 166.)  The doctor noted that plaintiff sometimes found it difficult to

22   concentrate, and sometimes felt annoyed with his auditory hallucinations;

23   plaintiff had "insight that [the hallucinations] are not real." (CAR 166.)  An

24   interdisciplinary progress note from June 27, 2002 by Lisa Osterman, MFT

25

26        [1] Haldol helps to reduce the symptoms of mental disorders such as

27   schizophrenia. The PDR Pocket Guide to Prescription Drugs 572 (Medical Economics Company, Inc. 2002) (1996).

28

1  Intern, reported that plaintiff had remained "clean and sober" for 23 months
2  and 25 days.  (CAR 144.)

3      A medication service plan dated July 17, 2002 reported that plaintiff was
4  prescribed Zyprexa to help decrease his hallucinations.  (CAR 129.)  The
5  treating physician sought to maintain plaintiff's functioning through the use of
6  the medication.  (CAR 129.)  A medication service plan over a year and a half
7  later, on March 23, 2004, indicated that a psychiatrist prescribed plaintiff with
8  Zyprexa for psychosis.  (CAR 124.)

9      A Riverside County DMH progress note dated April 19, 2004 indicated
10 that plaintiff was working 24 hours per week, working in between three and
11 eight hours on a given workday.  (CAR 137.)  The physician discussed dietary
12 changes with plaintiff and encouraged more exercise.  (CAR 137.)

13     Plaintiff consulted with Edward P. Case, M.D. at Riverside County
14 DMH on July 12, 2004.  (CAR 135.)  Dr. Case reported that plaintiff heard
15 voices only at night, and that the voices had subsided to a whisper.  (CAR
16 135.)  Plaintiff was doing well on his medications, and reported that the
17 medications "have made a big difference in his life."  (CAR 135.)

18     On September 21, 2004, plaintiff visited with Cristina Alonzo, M.D. at
19 the Riverside County DMH.  (CAR 134.)  Dr. Alonzo noted that plaintiff was
20 sleeping "pretty well," his appetite was "balanced," and he smoked "3/4 packs
21 [3 to 4] per day."  (CAR 134.)  The voices in plaintiff's mind were "down to
22 whispers."  (CAR 134.)  The doctor noted that plaintiff first started hearing
23 these voices when he was still using drugs.  (CAR 134.)

24     Dr. Alonzo further indicated that plaintiff's brother and sister committed
25 suicide by shooting themselves.  (CAR 134.)  Plaintiff most recently worked in
26 July 2004 as a groundskeeper for a storage facility.  (CAR 134.)

27     On an unspecified day after November 16, 2004, Dr. Alonzo completed
28 a short-form evaluation for mental disorders regarding plaintiff.  (CAR 179-

81.)  Dr. Alonzo indicated that she had only seen plaintiff two times.  (CAR 181.)  The doctor reported that plaintiff maintained orientation to all spheres, and had intact concentration, normal memory, and average intelligence.  (CAR 179.)  The doctor also noted that plaintiff had fleeting suicidal thoughts and was manipulative at times.  (CAR 180.)

Dr. Alonzo confirmed that plaintiff suffered from auditory hallucinations, which included "dirty language," vulgarity, and the word "kill." (CAR 180.)  The doctor diagnosed plaintiff with "Psychosis NOS vs. Schizophrenia, Chronic undifferentiated type" on Axis I, and Polysubstance dependence in remission and antisocial personality disorder on Axis II.  (CAR 179.)  Dr. Alonzo described plaintiff as "stable," and rated his abilities in the following areas as "good:" a) understanding, remembering, and carrying out complex instructions; b) understanding, remembering, and carrying out simple instructions; c) maintaining concentration, attention and persistence; and d) performing activities within a schedule and maintaining regular attendance. (CAR 181.)  The doctor rated plaintiff's abilities in the following areas as "fair:" a) completing a normal workday and workweek without interruptions from psychologically based symptoms; and b) responding appropriately to changes in a work setting.  (CAR 181.)

On December 28, 2004, Ed O'Malley, M.D. completed a psychiatric review technique form.  (CAR 182-195.)  Dr. O'Malley reported that plaintiff had persistent psychotic features and deterioration under the category "Schizophrenic, Paranoid and Other Psychotic Disorders."  (CAR 184.) Dr. O'Malley also observed that plaintiff experienced behavioral or physical changes related to substance use under the category "Substance Addiction Disorders."  (CAR 190.)  The doctor categorized the latter condition as a medically determinable impairment and labeled it polysubstance dependence. (CAR 190.)  The doctor concluded that plaintiff's impairments were not

severe.  (CAR 182.)  The doctor rated plaintiff's functional limitations in the following areas as "mild:" a) restriction of activities of daily living; b) difficulties in maintaining social functioning; c) difficulties in maintaining concentration, persistence, or pace; and d) episodes of decompensation.  (Car 192.)  The doctor also noted that these functional limitations were "not severe."  (CAR 192.)

Plaintiff underwent another medical consultation on an unspecified day.  (CAR 196.)  An unspecified physician reviewed plaintiff's medical file, and noted that plaintiff had an antisocial personality as well as a history of polysubstance dependence.  (CAR 196.)  The doctor described plaintiff as irritable and manipulative, but assessed his concentration as intact, his memory as within normal limits, and his intelligence as average.  (CAR 196.)  The doctor also noted that plaintiff had a normal mood and an appropriate affect.  (CAR 196.)

The unspecified doctor further reported that plaintiff had trouble sleeping and difficulty completing and understanding tasks.  (CAR 196.)  The doctor indicated that plaintiff heard voices when by himself, and that sometimes plaintiff would see a figure that looked like a ghost.  (CAR 196.)  The doctor concluded that plaintiff was only partially credible because the objective medical evidence did not fully support plaintiff's allegations.  (CAR 196.)  The doctor further commented that plaintiff denied current alcohol or drug abuse, and described plaintiff as "stable."  (CAR 196.)

In a Riverside County DMH progress note dated February 2, 2005, Dr. Alonzo stated that plaintiff was "[d]oing well on current dose of Zyprexa."  (CAR 132.)  Dr. Alonzo described plaintiff as "stable" on his medications, and detected no associated side effects.  (CAR 132.)  The doctor also noted that plaintiff was not "overtly psychotic."  (CAR 132.)

On February 15, 2005, Emanuel H. Rosen, M.D. completed a functional

1    capacity assessment.  (CAR 197-200.)  Dr. Rosen rated plaintiff's capabilities

2    as "moderately limited" in the following areas: a) the ability to understand and

3    remember detailed instructions; b) the ability to carry out detailed instructions;

4    and c) the ability to interact appropriately with the general public.  (CAR 197-

5    98.)  The doctor concluded that plaintiff could: a) "perform one and two step

6    repetitive work tasks" for a normal length workday and workweek; b) interact

7    appropriately with coworkers and supervisors, but not with the general public;

8    and c) adapt appropriately to different work settings and to changes in work

9    settings.  (CAR 199.)

10        On the same day, Dr. Rosen completed a psychiatric review technique

11   form.  (CAR 201-214.)  The doctor reported that plaintiff had the following

12   medically determinable impairments: a) psychosis; and b) polysubstance

13   dependence.  (CAR 203, 209.)  The doctor did not indicate, however, that

14   plaintiff's psychotic features and deterioration were persistent, nor did the

15   doctor state that plaintiff suffered from any behavioral or physical changes as a

16   result of his substance use.  (CAR 203, 209.)  The doctor concluded that a

17   residual functional capacity assessment was necessary.  (CAR 201.)

18        Plaintiff also underwent a medical consultation with Dr. Rosen on

19   February 15, 2005.  (CAR 215.)  The doctor reviewed the medical evidence

20   and noted that plaintiff had a history of hallucinations which plaintiff was able

21   to control and handle.  (CAR 215.)  Dr. Rosen stated that plaintiff was still

22   hearing increasingly loud voices, but that plaintiff's current medications were

23   working well.  (CAR 215.)  The doctor further observed that plaintiff was not

24   overly psychotic, and that plaintiff was "stable."  (CAR 215.)

25        On February 17, 2005, Dr. Alonzo completed a narrative report

26   regarding plaintiff.  (CAR 218.)  Dr. Alonzo reported that plaintiff had mildly

27   impaired memory and moderately impaired judgment.  (CAR 218.)  The doctor

28   also found evidence of confusion, insomnia, anxiety, and inappropriate affect.

1   (CAR 218.)

2       Dr. Alonzo concluded that plaintiff could do none of the following: a)

3   maintain a sustained level of concentration; b) sustain repetitive tasks for an

4   extended period; and c) adapt to new or stressful situations.  (CAR 218.)

5   Plaintiff was capable of interacting appropriately with family members.  (CAR

6   218.)  The doctor gave an overall prognosis of "chronic," and also commented

7   that plaintiff "needs to continue attending AA [meetings] regularly."  (CAR

8   218.)

9       On April 3, 2006, plaintiff underwent a psychiatric evaluation with

10  Reynaldo Abejuela, M.D.. (CAR 234-241.)  Dr. Abejuela stated that plaintiff

11  initially expressed anger towards the Supplemental Security Income office, and

12  asked whether he would immediately receive his disability.  (CAR 237.)

13  Plaintiff became more cooperative during the latter part of the examination.

14  (CAR 237.)

15      The evaluation revealed no evidence of severe depression or anxiety.

16  (CAR 237.)  Plaintiff was logical and coherent and his cognitive functioning

17  was normal.  (CAR 237.)  Plaintiff's impulse control was fair and his insight

18  was adequate.  (CAR 237.)  Dr. Abejuela reported no bizarre delusions or

19  paranoia.  (CAR 237.)

20      Plaintiff reported that he experienced psychotic symptoms such as

21  hearing and seeing things.  (CAR 239.)  Plaintiff provided an example of an

22  auditory hallucination wherein voices told him, in a vulgar fashion, that

23  Supplemental Security Income "is not helping him and that is why he has to

24  kill himself."  (CAR 239.)  Plaintiff, however, denied suicidal plans or

25  intentions.  (CAR 239.)  Plaintiff reported depression and feelings of

26  hopelessness because he had no income to support himself.  (CAR 239.)

27  Plaintiff described his concentration and memory as "forgetful."  (CAR 239.)

28      Objective findings showed that plaintiff was experiencing mild

depression, mild anxiety, and mild auditory and visual hallucinations.  (CAR 239.)  The examination revealed no evidence of alcohol intoxication, and the doctor did not note any ataxia, tremors, or slurring of speech.  (CAR 239.)  Plaintiff's reasoning and comprehension were intact.  (CAR 239.)

Dr. Abejuela indicated that plaintiff had mild impairments in the following areas: a) concentration, persistence, and pace; b) ability to understand, carry out, and remember complex instructions; c) response to co-workers, supervisors, and the public; d) ability to respond appropriately to usual work situations; and e) ability to deal with changes in a routine work setting.  (CAR 240.)  The latter limitation did not preclude function.  (CAR 240.)  Dr. Abejuela diagnosed plaintiff on Axis I with "Substance-induced Psychotic Symptoms vs. Polysubstance Dependence including Alcohol and Methamphetamines."  (CAR 238.)

After reviewing plaintiff's mental health records and the results of plaintiff's psychiatric evaluation, Dr. Abejuela concluded that plaintiff's occupational and social functioning impairment was "none to mild," and his psychiatric limitations were also "none to mild."  (CAR 239-240.)  Dr. Abejuela further concluded that plaintiff's psychiatric prognosis was "fair."  (CAR 241.)  The doctor forecast that plaintiff's condition would abate in the upcoming few months with continued use of medication and continued abstention from alcohol and methamphetamines.  (CAR 241.)

**C.     Testimony Before the Administrative Law Judge**

**1.     <u>Plaintiff's Testimony</u>**

Plaintiff testified on his own behalf at the March 2, 2006 hearing before the ALJ.  (CAR 252-264.)  Plaintiff stated that he was fifty-four years old and

///

///

///

1   had attended high school through the tenth grade.[2]  (CAR 252-53.)  Plaintiff

2   reported that he attended driving school in Oregon and received his

3   commercial driver's license approximately twenty years before the ALJ hearing.

4   (CAR 253.)

5          Plaintiff testified that he began using drugs and alcohol as a child, and

6   has used every type of drug except for heroine.  (CAR 254.)  Plaintiff testified

7   that he became unable to continue his work as a truck driver due to his alcohol

8   and drug use.  (CAR 255.)  Plaintiff recalled that he has worked consistently

9   from 1969 to 1998, but was unable to work for a couple of years during that

10  time period due to excessive drug and alcohol use.  (CAR 254.)  Plaintiff

11  explained that he attends Alcoholics Anonymous meetings seven times a week,

12  and has not used alcohol in five years and eight months.  (CAR 253.)  Plaintiff

13  approximated that he has spent four or five years in jail as a consequence of his

14  drug use.  (CAR 261.)  Plaintiff further explained that he has not driven in ten

15  years because his driver's license was suspended after he could not fulfill his

16  child support obligations; his license has now been revoked.  (CAR 252, 263.)

17         Plaintiff opined that it is difficult for him to work because he becomes

18  very nervous around people, and he has difficulty focusing his attention on a

19  specific objective.  (CAR 255.)  Plaintiff stated that voices emerge in his mind

20  when he attempts to focus on a specific objective, and he sometimes talks back

21  to the voices.  (CAR 255.)  Plaintiff reported that he had been experiencing

22  difficulty with voices in his head for approximately six years before the hearing

23  with the ALJ.  (CAR 255.)  Plaintiff also explained that his medications

24  initially curtailed the voices in his head; the voices would eventually return,

25  however, and increased dosages would stop the voices for only a couple of days.

26

27  _____

28         [2]  Plaintiff appeared to testify that he earned his GED, but did not actually receive his GED because he was too young at the time.  (CAR 260.)

1    (CAR 256.)

2        Plaintiff recounted that he ordinarily starts his day at around 8:00 a.m.

3    or 9:00 a.m., and takes his medication at 9:30 a.m. every morning.  (CAR

4    257.)  Plaintiff testified that he spends the majority of each day reading in his

5    room; he also completes light chores around the house, such as cleaning his

6    room and washing dirty laundry.  (CAR 257.)  Plaintiff testified that he leaves

7    for his Alcoholics Anonymous meetings at approximately 7:00 p.m.  (CAR

8    257.)

9        Plaintiff related that the voices in his head tell him "to do strange

10   things," and that it is very difficult to ignore the strange requests.  (CAR 258.)

11   Plaintiff also testified that he tried to work approximately three years before his

12   hearing with the ALJ as a mini-storage worker at an airport, but his mental

13   difficulties eventually made it too difficult to maintain that job.  (CAR 258.)

14       2.    Vocational Expert's Testimony

15       The VE testified before the ALJ at the March 2, 2006 hearing.

16   (CAR 260, 262-63.)  The VE opined that plaintiff's past relevant work

17   experience in mini-storage work is classified as medium, unskilled work with an

18   SVP of 2; his construction work is classified as very heavy, unskilled work with

19   an SVP of 2; his welder and tube washer work is classified as medium, skilled

20   work with an SVP of 6; his hand packing work is classified as medium,

21   unskilled work with an SVP of 6; his truck driving work is classified as

22   medium, semiskilled work with an SVP of 4; and his assembler brake press

23   operating work is classified as medium, semiskilled work with an SVP of 3.

24   (CAR 262.)

25       The ALJ presented the VE with a hypothetical individual with the same

26   age, education, and work experience as plaintiff, no exertional level limitations,

27   no capacity to work at unprotected heights or on dangerous machinery, and an

28   inability to drive.  (CAR 263.)  The ALJ also emphasized that this hypothetical

1    individual "should work with things rather than with people."  (CAR 263.)

2    The VE concluded that such an individual could perform plaintiff's past

3    relevant work in the mini-storage and hand packaging positions.  (CAR 263.)

4    The ALJ then presented the VE with a second hypothetical individual with all

5    the same limitations provided in the first hypothetical, except that such

6    individual is "off task at least 20 percent of the time from psychological-based

7    symptoms."  (CAR 263.)  The VE concluded that such an individual would be

8    unable to perform any work in the economy.  (CAR 263.)

9    **D.    The ALJ's Decision**

10         On August 21, 2006, the ALJ issued a decision denying plaintiff's

11    applications for benefits.  (CAR 11-15.)  The ALJ determined that plaintiff has

12    psychosis with auditory hallucinations.  (CAR 13.)  The ALJ concluded,

13    however, that plaintiff does not have a "severe" impairment or combination of

14    impairments that significantly limits his ability to perform basic work-related

15    activities.  (CAR 13.)  The ALJ also found that Dr. Alonzo's February 17, 2005

16    mental health report is entitled to little weight because it is inconsistent with

17    Riverside County treating notes.  (CAR 15.)  Accordingly, the ALJ concluded

18    that plaintiff was not disabled within the meaning of the Social Security Act

19    and thus, was not eligible for either Disability Insurance Benefits or

20    Supplemental Security Income.  (CAR 15.)

21

22    **III.  STANDARD OF REVIEW**

23         Under 42 U.S.C. § 405 (g), a district court may review the

24    Commissioner's decision to deny benefits.  The Commissioner's  (or ALJ's)

25    findings and decision should be upheld if they are free of legal error and

26    supported by substantial evidence.  However, if the court determines that

27    findings are based on legal error or are not supported by substantial evidence in

28    the record, the court may reject the findings and set aside the decision to deny

1    benefits.  See McCartey v. Massanari, 298 F.3d 1072, 1075 (9th Cir. 2002);

2    Tonapetyan v. Halter, 242 F.3d 1144, 1147 (9th Cir. 2001); Osenbrock v.

3    Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).

4        "Substantial evidence is more than a scintilla, but less than a

5    preponderance."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998).  It is

6    "relevant evidence which a reasonable person might accept as adequate to

7    support a conclusion."  (Id.)  To determine whether substantial evidence

8    supports a Commissioner's findings, the reviewing court "must review the

9    administrative record as a whole, weighing both the evidence that supports and

10   the evidence that detracts from the Commissioner's conclusion."  (Id.)  "If the

11   evidence can reasonably support either affirming or reversing," the reviewing

12   court "may not substitute its judgment" for that of the Commissioner.

13   Reddick, 157 F.3d at 720-721; see also Osenbrock, 240 F.3d at 1162.

14

15                **IV.  THE FIVE-STEP ANALYSIS**

16   **A.      Initial Five-Step Analysis**

17        A disability claimant must show that a medically determinable physical

18   or mental impairment prevents the claimant from engaging in substantial

19   gainful activity and that the impairment is expected to result in death or to last

20   for a continuous period of at least twelve months.  Reddick v. Chater, 157 F.2d

21   at 721; 42 U.S.C. § 423 (d)(1)(A).

22        Disability claims are evaluated according to the five-step procedure

23   described below.  See Bowen v. Yucker, 482 U.S. 137, 140-42, 107 S. Ct.

24   2287, 96 L. Ed. 2d 119 (1987); Reddick, 157 F.3d at 721; Lester v. Chater, 81

25   F.3d 821, 828 n.5 (9th Cir. 1995, as amended April 9, 1996); 20 C.F.R §§

26   404.1520, 416.920.

27        **Step one:**  Is the claimant engaging in substantial gainful activity?  If so,

28   the claimant is found not disabled.  If not, proceed to step two.

1    **Step two:** Does the claimant have a "severe impairment"?  If so, proceed

2    to step three.  If not, then a finding of not disabled is appropriate.

3    **Step three:**  Does the claimant's impairment or combination of

4    impairments meet or equal an impairment in 20 C.F.R., Part 404, Subpart P,

5    Appendix 1 (hereinafter "the Listings")?  If so, the claimant is automatically

6    determined disabled.  If not, proceed to step four.

7    **Step four:**  Is the claimant capable of performing his past work?  If so,

8    the claimant is not disabled.  If not, proceed to step five.

9    **Step five:**  Does the claimant have the residual functional capacity to

10   perform any other work?  If so, the claimant is not disabled.  If not, the

11   claimant is disabled.  Lester, 81 F.3d at 828 n.5.

12   "Severe" (at step two) means any impairment or combination of

13   impairments that significantly limits the physical or mental ability to perform

14   basic work activities.  "Residual functional capacity" ("RFC") is what a

15   claimant can still do despite existing "exertional" (i.e, strength related) and

16   "nonexertional" limitations.  Cooper v. Sullivan, 880 F.2d 1152, 1155 ns.5-6

17   (9th Cir. 1989).  Nonexertional limitations restrict ability to work without

18   directly limiting strength, and include mental, sensory, postural, manipulative

19   and environmental limitations.  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir.

20   1993); Cooper 800 F.2d at 1155 n.7; 20 C.F.R. §404.1569a(c).[3]

21   A claimant has the burden (through step four) of proving inability to

22   perform past relevant work.  Reddick, 157 F.3d at 721; Drouin v. Sullivan, 966

23

24   _____

         [3]Nonexertional limitations include difficulty in one or more of the following:

25   functioning because of nervousness, anxiety or depression, maintaining attention or

     concentration; understanding instructions; seeing or hearing, tolerating physical features

26   of a work setting; and manipulative or postural functions (e.g. reaching, handling,

     stooping or crouching).  See 20 C.F.R. § 404.1569a(c)(1).  Pain may be either an

27   exertional or nonexertional limitation.  Penny, 2 F.3d at 959; Perminter v. Heckler, 765

     F.2d 870, 872 (9th Cir. 1985); 20 C.F.R. § 404.1569a(c).

28

F.2d 1255, 1257 (9th Cir. 1992).  If this burden is met, a <u>prima</u> <u>facie</u> case of disability is established and the burden shifts to the Commissioner (step five) to establish that the claimant can perform alternative work.  <u>Reddick</u>, 157 F.3d at 721; <u>Drouin</u>, 966 F.2d at 1257; 20 C.F.R. §§ 404.1520,  416.920.  The Commissioner can meet this burden by reference to the Medical-Vocational Guidelines ("Grids") at 20 C.F.R. Part 404, Subpart P, Appendix 2, or by relying on vocational expert ("VE") testimony.  <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1162 (9th Cir. 2001) (citing <u>Desrosiers v. Secretary</u>, 846 F.2d 573, 576-77 (9th Cir. 1988)).  If VE testimony is used, "the VE must identify a specific job or jobs in the national economy having requirements that the claimant's physical and mental abilities and vocational qualifications would satisfy."  <u>Osenbrock</u>, 240 F.3d at 1162-63.

**B.     Additional Five-Step Sequential Evaluation for Mental Impairments**

Where there is evidence of a mental impairment that allegedly prevents a claimant from working, the Commissioner must supplement the five-step sequential evaluation process with additional regulations dealing specifically with mental impairments.  <u>Maier v. Commissioner of the Soc. Sec. Admin.</u>, 154 F.3d 913, 914 (9th Cir. 1998) (per curiam).  The relevant regulations establish another five-step sequential evaluation procedure to be employed in evaluating mental impairments.  <u>Id.</u>  The procedure requires the evaluator to perform the following five steps:

**Step 1:** determine whether a mental impairment exists by recording pertinent symptoms and limitations;

**Step 2:** determine whether "certain medical findings which have been found especially relevant to the ability to work are present or absent";

**Step 3:** determine whether the impairment is severe by rating the degree of functional loss resulting from the impairment;

1    **Step 4:** determine whether the impairment, or a combination of

2    impairments, meet or equal a mental disorder listed in 20 C.F.R. pt. 404 subpt.

3    P, Appendix I; and

4        **Step 5:** complete a mental residual functional capacity assessment.

5    Maier v. Commissioner of the Soc. Sec. Admin., 154 F.3d at 914-15 (citing 20

6    C.F.R. § 416.920a).

7        When dealing with alleged mental disabilities, the inquiry at step three

8    has two parts.  In the first part, (Part A), the ALJ must determine whether

9    there is evidence to "medically substantiate the presence of a mental disorder."

10   20 C.F.R. pt. 404 subpt. P, Appendix I at § 12.00A.  When making this initial

11   determination, the ALJ can rely only on "medical evidence consisting of clinical

12   signs, symptoms and/or laboratory or psychological test findings."  Id. at

13   § 12.00B; Schnieder v. Commissioner of Social Security Administration, 223

14   F.3d 968, 974 (9th Cir. 2000).

15       In the second part, (Part B), the ALJ must determine whether the

16   "severity" of the claimant's "functional limitations" are "incompatible with the

17   ability to work."  20 C.F.R. pt. 404 subpt. P, Appendix I at § 12.00A;

18   Schneider, 223 F.3d at 974.  The ALJ makes this determination by ranking the

19   severity of the claimant's deficiencies (e.g. non, slight, moderate, marked,

20   extreme) in four different categories (e.g. daily living; social functioning;

21   concentration, persistence, or pace; and episodes of deterioration).  If the ALJ

22   finds that a claimant's functional limitations are at the extreme or marked level

23   in two of the four categories, then the claimant satisfies Part B [of the Listing].

24   See 20 C.F.R. pt. 404 subpt. P, Appendix I at § 12.04B; Schneider, 223 F.3d at

25   975.  A disability claimant must show that a medically determinable physical

26   or mental impairment prevents the claimant from engaging in substantial

27   gainful activity and that the impairment is expected to result in death or to last

28   for a continuous period of at least twelve months.  Reddick v. Chater, 157 F.2d

1   at 721; 42 U.S.C. § 423 (d)(1)(A).

2

3                              **V.   DISCUSSION**

4   **A.     The ALJ's Evaluation**

5           The ALJ found (at step one) that plaintiff has not engaged in substantial

6   gainful activity since the alleged onset of disability.  (CAR 13.)  Next, the ALJ

7   determined (at step two) that plaintiff does not suffer from an impairment

8   considered "severe" under 20 CFR §§ 404.1521 and 416.921.  (CAR 13.)

9   Thus, the ALJ concluded that plaintiff is not disabled.  (CAR 15.)

10          The parties have stipulated that the following three issues are in dispute:

11            1.  Whether the ALJ properly considered the treating physician's

12          opinion of disability;

13            2.  Whether the ALJ properly considered the treating psychiatrist's

14          medical source statement; and

15            3.  Whether the ALJ properly considered the severity of plaintiff's

16          mental impairment.

17   (Joint Stipulation, p. 3.)

18   **B.     Treating Physicians**

19          Plaintiff argues that the ALJ failed to articulate specific and legitimate

20   reasons for rejecting Dr. Patel's assessment of plaintiff on September 17,

21   2001.[4]  (Joint Stipulation, pp. 3-4.)  Plaintiff specifically points to the ALJ's

22   failure to address Dr. Patel's estimate of plaintiff's GAF (Global Assessment of

23   Functioning) and Dr. Patel's conclusion that plaintiff suffered from psychosis.

24   (CAR 3, 6.)  Defendant contends that Dr. Patel did not make any findings

25   which indicate that plaintiff is disabled.  (Id. at 4-6.)

26

27          [4] Plaintiff mistakenly referred to the date of Dr. Patel's assessment as "September

28   17, 2004."  (Joint Stipulation, p. 3.)

1    The opinion of a treating doctor generally should be given more weight

2 than opinions of doctors who do not treat the claimant.  Lester v. Chater, 81

3 F.3d 821, 830 (9th Cir. 1996).  If the treating doctor's opinion is not

4 contradicted by another doctor, it may be rejected only for "clear and

5 convincing" reasons supported by substantial evidence in the record.  Id. at 830

6 (citing Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991)).  Even when

7 the treating doctor's opinion is contradicted by the opinion of another doctor,

8 the ALJ may properly reject the treating doctor's opinion only by providing

9 "'specific and legitimate reasons' supported by substantial evidence in the

10 record for doing so."  Id. (citing Murray v. Heckler, 722 F.2d 499, 502 (9th Cir.

11 1983)).  The opinion of an examining physician is, in turn, entitled to greater

12 weight than the opinion of a nonexamining physician.  Lester, 81 F.3d at 830;

13 Gallant v. Heckler, 753 F.2d 1450 (9th Cir. 1984).

14    The ALJ determined that plaintiff does not have a severe impairment or

15 combination of impairments.  (CAR 13.)  The ALJ cited progress notes from

16 Riverside County DMH, and pointed out plaintiff's history of psychosis,

17 auditory hallucinations and previous alcohol abuse.  (CAR 14.)  The ALJ's

18 ultimate determination regarding the severity of plaintiff's impairment did not,

19 however, address or incorporate the GAF estimate in Dr. Patel's assessment of

20 plaintiff on September 17, 2001.

21    The question, therefore, is whether the ALJ provided specific and

22 legitimate reasons for rejecting the opinion of plaintiff's treating doctor.  The

23 ALJ did not provide reasons for rejecting Dr. Patel's opinion regarding

24 plaintiff's GAF.  Thus, the ALJ's requirement to present specific and legitimate

25 reasons for rejecting a treating physician's opinion has not been satisfied.

26    Plaintiff also argues that the ALJ failed to articulate specific and

27 legitimate reasons for disregarding Dr. Alonzo's findings in a short-form

28 evaluation for mental disorders.  (Joint Stipulation, pp. 6-8.)  Specifically,

plaintiff argues that the ALJ failed to consider Dr. Alonzo's rating of plaintiff's ability to: a) complete a workday and workweek without psychologically based interruptions; and b) respond appropriately to changes in a work setting.  (Joint Stipulation, pp. 7-8.)  Defendant argues that the ALJ validly rejected Dr. Alonzo's separate findings on February 17, 2005 because those findings were not supported by Riverside County DMH treatment records.  (Joint Stipulation, pp. 8-11.)  Defendant contends that the ALJ's consideration of Dr. Alonzo's findings on February 17, 2005 shows that the ALJ did not selectively omit a discussion of Dr. Alonzo's previous findings in the short-form evaluation for mental disorders.  (Id. at 11.)

The ALJ referred to Dr. Alonzo's report on February 17, 2005.  (CAR 15.)  The ALJ explained that he gave little weight to this report because it is inconsistent with Riverside County DMH progress notes.  (CAR 15.)  The ALJ did not, however, make any mention of Dr. Alonzo's short-form evaluation for mental disorders.  (CAR 179-81.)  The ALJ's ultimate determination regarding the severity of plaintiff's impairment did not address or incorporate Dr. Alonzo's evaluation of plaintiff's ability to: a) complete a workday and workweek without psychologically based interruptions; and b) respond appropriately to changes in a work setting.

The question, therefore, is whether the ALJ provided specific and legitimate reasons for rejecting the opinion of plaintiff's treating doctor.  The ALJ did not provide reasons for rejecting Dr. Alonzo's opinions in her short-form evaluation for mental disorders.  (CAR 179-81.)  Thus, the ALJ's requirement to present specific and legitimate reasons for rejecting a treating physician's opinion has not been satisfied.

**C.    Remedy**

The decision whether to remand for further proceedings or order an immediate award of benefits is within the district court's discretion.  Harman v.

1    <u>Apfel</u>, 211 F.3d 1172, 1175-78 (9th Cir. 2000).  Where no useful purpose

2    would be served by further administrative proceedings, or where the record has

3    been fully developed, it is appropriate to exercise this discretion to direct an

4    immediate award of benefits.  <u>Id.</u> at 1179 ("the decision of whether to remand

5    for further proceedings turns upon the likely utility of such proceedings").

6    However, where there are outstanding issues that must be resolved before a

7    determination of disability can be made, and it is not clear from the record that

8    the ALJ would be required to find the claimant disabled if all the evidence were

9    properly evaluated, remand is appropriate.  <u>Id.</u>

10       Here, this Court has found that the ALJ failed to properly consider the

11   opinions of plaintiff's treating physicians.  Accordingly, remand is necessary so

12   that further administrative proceedings may be conducted.   Specifically, on

13   remand, the ALJ should consider the findings and conclusions of Drs. Patel and

14   Alonzo, and, in light of that evidence, determine whether plaintiff suffers from

15   a disability as defined by the Social Security Act.  If the ALJ chooses to reject

16   the opinions of Drs. Patel and Alonzo, the ALJ must provide specific and

17   legitimate reasons for doing so.[5]

18

19                                          **<u>ORDER</u>**

20       Accordingly, IT IS HEREBY ORDERED that this action is remanded to

21   the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

22   ///

23   ///

24

25           [5]  Since this Court has determined that remand is necessary to conduct further

26   proceedings, the Court does not address the third disputed issue presented by the parties:
     namely, a) whether the ALJ properly considered the severity of plaintiff's mental

27   impairment.  (Joint Stipulation, p. 3.)  This issue should also be addressed by the ALJ

28   on remand.

1    IT IS FURTHER ORDERED that the Clerk of the Court serve copies of

2    this order and the Judgement herein on all parties or their counsel.

3

4    DATED:  October 29, 2008

5

6    _____
                                /s/

7    JEFFREY W. JOHNSON
     United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28